## HELLIER v. BAUSH MACH. TOOL CO. et al.

Circuit Court of Appeals, First Circuit.
October 4, 1927.

No. 2086.

**1. Corporations ⟠⟿401—Acts of two corporations having common directors will be closely investigated, but are not necessarily void or constructively fraudulent.**

Acts of two corporations having common directors will be very closely investigated, but are not necessarily void or constructively fraudulent, and, if they are fair to all stockholders, court will sustain them.

**2. Corporations ⟠⟿197—Stockholder may vote stock for purchase of property in which he has interest, unless unfair or improper means are employed.**

It is legal for a stockholder to vote his stock for purchase of property in which he has an interest, unless unfair or improper means' are employed which are fraudulent or oppressive toward other stockholders.

**3. Corporations ⟠⟿320(11)—Evidence held to sustain finding of no fraud or concealment of facts in submitting transaction for transfer of assets between corporations having common directors.**

In suit by minority stockholder, wherein it was claimed that certain directors conspired to sell and transfer assets from one corporation to another, causing serious losses, evidence *held* to sustain finding that there was no fraud or concealment of facts from stockholders which should have been known to them at time of submitting transaction for their approval.

Appeal from the District Court of the United States for the District of Massachusetts; George F. Morris, Judge.

Suit by Edward W. Hellier against the Baush Machine Tool Company and others. Decree for defendants, and plaintiff appeals. Affirmed.

Arthur Berenson and William P. Everts, both of Boston, Mass. (Thomas W. Morris and Everts, Keenan & Aldridge, all of Boston, Mass., on the briefs), for appellant.

Charles F. Choate, Jr., and John Noble, both of Boston, Mass. (Frederick H. Nash, James Garfield, Samuel Vaughan, Howard R. Brentlinger, and Calvin P. Bartlett, all of Boston, Mass., on the briefs), for appellees.

Before BINGHAM and JOHNSON, Circuit Judges, and MORTON, District Judge.

JOHNSON, Circuit Judge. This is a minority stockholders' bill. The defendants are the Baush Machine Tool Company, Huron Metals Company, Augustus P. Loring, Arioch W. Erickson, George D. Haskell, Caleb Loring, Bowen Tufts, Roger D. Babson, James H. Drury, and Willoughby H. Stuart, Jr.

The gist of the complainant's bill is that the individual defendants, as directors of the Baush Machine Tool Company, hereinafter called Baush, conspired to sell and transfer the assets of the Huron Metals Company, hereinafter called Huron, to Baush for a secret and unlawful profit, thereby causing Baush and its stockholders large and serious losses; that Augustus P. Loring was the dominating power and influence in the corporate affairs and business of Baush, controlling its officers, directors, and employees, and a majority of its stockholders; that he and the defendant Arioch W. Erickson, who with their families were large creditors of the Metals Production & Equipment Company, hereinafter called the Metals Company, had acquired its assets from its trustee in bankruptcy and caused Huron to be incorporated and to take over these assets with a view of selling them to Baush, knowing that Huron could never be conducted profitably and that the acquisition of its assets would cause Baush large losses; that this was done for their secret benefit and profit; and that the acquisition by Baush of the assets of Huron was ultra vires and void and in violation of the laws of Massachusetts. The prayer of the bill, in substance, is that an account be taken of the damages suffered by Baush and a decree entered that the defendants pay the same.

The plaintiff alleges that he is the owner of 125 shares of stock of Baush which he acquired December 29, 1913. Baush was incorporated under the laws of Massachusetts in 1896 for "the manufacture and sale of machine tools, structural iron work, castings of iron, brass, and other metals, and dealing in mechanical supplies." It is located in the city of Springfield, in the commonwealth of Massachusetts. About 1912 Augustus P. Loring became interested in the corporation and one of its directors. Before the consolidation, hereinafter described, its capital stock consisted of 12,500 shares of common stock and 6,100 shares of preferred, each of the par value of $100.

After Augustus P. Loring became interested in the company, its foundry business was sold to the Quigley Furnace & Foundry Company, another corporation in which he was a stockholder, and whose directors were his son, Caleb Loring, the defendant Haskell, and himself. The Quigley Company was not successful, and he and the defendant Erickson and their families loaned it large sums of money to keep it going.

At the beginning of the World War, the fortunes of the Quigley Company began to improve, and its name was changed to the Metals Production & Equipment Company. Suit was brought against the Metals Company and an attachment made of all its property. An equity receivership followed, and finally it was adjudicated a bankrupt June 15, 1918. Its property was appraised in the bankruptcy court at $633,832.91, which the District Court found to be conservative and less than its actual value. Later Augustus P. Loring and Erickson acquired from the trustee in bankruptcy all the property of the company except its cash for $515,000, subject to a mortgage of $150,000, an attachment for $5,000, which was not discharged by bankruptcy proceedings, and current taxes. They caused the Huron Metals Company to be incorporated under the laws of Delaware, and transferred to it the property so acquired, receiving therefor 15,000 shares of its preferred stock of the par value of $100, and 15,000 shares of common stock of no par value. This stock was divided between Loring and Erickson and their families in proportion to the amount of moneys which had been advanced by them to the Metals Company, whose indebtedness to them was more than 90 per cent. of its total indebtedness, and amounted to approximately $1,300,000. The officers of Huron were Erickson, president, A. P. Loring, vice president, Caleb Loring, treasurer, who, with Albert De Lavandeyra and his son, were directors.

George D. Haskell, one of the defendants who was associated with Augustus P. Loring in many enterprises, in the interest of one of which he visited England, heard of duralumin, an alloy of aluminum, and acquainted Augustus P. Loring with its properties and the result of his investigation. Erickson and Loring were looking for some business for Huron, which had been successful during the World War but whose business at its close had largely disappeared. The manufacture of duralumin seemed to be something for which it was well equipped.

Before Huron was organized, Haskell, acting for Erickson and Loring, had got in touch with the De Lavandeyras, father and son, who were manufacturing acieral, a metal similar to duralumin, and made an arrangement with them to conduct experiments at the Metals Company plant while it was being operated by the trustee. In 1919 an agreement was made by Haskell, acting for Loring and Erickson, with Albert De Lavandeyra, by which he should become a director of a corporation to be formed to take over the assets of the Metals Company, and receive $500,000 par value of its common stock to be placed in escrow and delivered to him when and if he succeeded in the manufacture of at least 100,000 pounds of acieral per month for a period of three successive months.

Baush had made large earnings during the war, and its financial returns were abnormal. Near the close of the year 1920, machine tools and gears which it had manufactured were displaced by others, and its prosperity seemed to be at an end unless it undertook some new business. Baush took a lease of the Huron plant in 1919, under the terms of which Huron was to receive 87½ per cent. of the profits made from the manufacture of the new metal, and Baush 12½ per cent. and furnish all the capital needed for the conduct of the business. At the time the lease was taken, A. P. Loring, Tufts, Hyde, Babson, Drury, Caleb Loring, Stuart, and Haskell were among the directors of Baush. The District Court has found that the interest of A. P. Loring in Huron was disclosed to the other directors and that the lease was made in the interest of all the stockholders of Baush. We think this finding is sustained by the evidence. Baush operated about two years under the lease, expending considerable sums of money in experimenting in the manufacture of Baush duralumin. Reports were made from time to time to its stockholders, stating in substance that the experiments were successful and holding out the promise of future returns.

A committee of five of its directors was selected to investigate and report upon the advisability of acquiring the property of Huron, whose plant was admirably equipped for the manufacture of duralumin. After two adverse reports, the committee finally reported in favor of a plan for the consolidation of the two companies. Their report was accepted by the directors, who voted to adopt the plan approved by the committee and to submit it to the stockholders for their approval. This plan involved the increase of the capital stock of Baush from 12,500 shares of the par value of $100 each to 50,000 shares of no par value, and the transfer to Huron of 22,500 shares of its common stock; one share of the common stock of Baush to be exchanged for two shares of the common stock of Huron or for one share of its preferred stock.

[1] The plan of consolidation was passed upon by the stockholders of Baush at a meeting held upon July 26, 1921. In the call for

the meeting, the plan of consolidation was set out at length and the meeting was legally called and held. While there was conflicting evidence as to whether the plaintiff had given any proxy to vote his stock at this meeting, the District Court has made the following finding: "I do not find that he ever consented to the acquisition of the Huron plant by the Baush Company, or that he is estopped by anything he did from maintaining this action."

It is contended that because Caleb Loring was a director of both corporations, and some of the directors of Huron were stockholders of Baush, the act of consolidation was void. While in some jurisdictions this has been held to be the law, it is not so held generally nor by the Supreme Court. The law as stated by the Supreme Court is that acts of two corporations having common directors will be very closely investigated; that they are not necessarily void or constructively fraudulent. If they are fair to all the stockholders, the court will sustain them.

In Geddes v. Anaconda Mining Co., 254 U. S. 590, 599, 41 S. Ct. 209, 212 (65 L. Ed. 425), the court said: "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and, where the fairness of such transactions is challenged, the burden is upon those who would maintain them to show their entire fairness and, where a sale is involved, the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 588, 23 L. Ed. 328; Thomas v. Brownville, Fort Kearney & Pacific Railroad Co., 109 U. S. 522, 3 S. Ct. 315, 27 L. Ed. 1018; Wardell v. Railroad Co., 103 U. S. 651, 658, 26 L. Ed. 509; Corsicana National Bank v. Johnson, 251 U. S. 68, 90, 40 S. Ct. 82, 64 L. Ed. 141." In the last case cited the court said, at page 90 (40 S. Ct. 91): "That two corporations have a majority or even the whole membership of their boards of directors in common does not necessarily render transactions between them void; but transactions resulting from the agency of officers or directors acting at the same time for both must be deemed presumptively fraudulent unless expressly authorized or ratified by the stockholders."

Cook on Corporations, vol. 3, § 662, summarizes the law as follows: "It often happens that a consolidation, lease, sale, or contract between two corporations is made where, first, the directors of one of the corporations are largely interested in the stock of the other; or, second, one corporation owns a majority of the stock of the other; or, third, the same person or persons own a majority of the stock of both corporations. There then is likely to arise a conflict between interest and duty. Such contracts as these are investigated very closely by courts. They are not necessarily void, and are not constructively fraudulent. But, if there is actual fraud or if there has been an undue advantage taken or an unconscionable bargain made, the court will set it aside. If the transaction is fair, the court will sustain it; if it is unfair, the court will undo it. * * * A much more difficult question arises as to whether the stockholders in meeting assembled may ratify and legalize, notwithstanding the protest of the minority, dealings where the majority have interests different from those of the minority. Here again the courts refuse to lay down any hard and fast rules. Such a ratification is futile if there is unfairness in the transaction, amounting to actual fraud; otherwise the courts will not interfere."

The District Court has found that the common director, Caleb Loring, "was not a dominating mind in either company, and, aside from the fact that he had one vote in each company, his influence to no appreciable extent controlled the action taken. * * * Had the final action of Baush depended upon his conduct, quite a different problem would be presented, both as to the burden of proof and as to its legal phases. * * * He was not an influential factor in bringing about the purchase or arranging its terms. If it can be said the transaction was presumptively fraudulent because of a common director, I find that presumption is overcome by satisfactory proof. * * * Whatever may have been the legal effect of the relations borne by Caleb Loring to the two corporations with respect to his acts at the directors' meetings, it was not at those meetings that the purchase was finally authorized. The sale was finally consummated by the stockholders of the two corporations, and the fact that Caleb Loring was a director of both becomes of little or no consequence as a legal proposition." The District Court also found that at the time of the consolidation the several defendants and their families owned or controlled 1,809 shares of the 12,500 shares of the outstanding common stock of Baush and 389

of the 3,751 of its outstanding preferred shares, and stated: "There was no individual who held a stock control of both corporations and no conspiracy or combination of stockholders to control the meeting for the purpose of secret gain or to injure Baush or its minority stockholders. The directors and others who voted their stock in favor of the purchase believed they were acting for the best interests of the corporation."

[2] The law is well settled that it is legal for a stockholder to vote his stock for the purchase of property in which he has an interest, unless unfair or improper means are employed which are fraudulent or oppressive toward the other stockholders. All of the defendants testified at length before the trial judge, and he has found that there was no domination or undue influence exercised by or over any of them. The call for the stockholders' meeting to pass upon the plan of consolidation with the recommendation of the directors of Baush did not withhold from the stockholders any necessary information, but laid before them fairly the condition of both companies, and was in part as follows:

"To the Stockholders of the Baush Machine Tool Company:

"About two years ago your company took a lease from the Huron Metals Company covering the plant owned by that company at Springfield, Mass., and certain patent rights. At this plant has been developed the aluminum alloy now known as Baush duralumin. The taking over of this lease and the development of this metal was in conformance with the policy already adopted by the management of providing the company with a business so diversified as to escape some of the violent fluctuations to which the machine tool business as a whole has always been subject. The Baush universal joint and the Baush worm gear, already previously adopted by the management with the same purpose in view, have been extremely profitable, but in a lesser degree are also subject to fluctuation. At the time the agreement of lease with the Huron Metals Company was executed, your board of directors felt that, before committing the company too far along a new line, it would be better to wait until the new metal was fully developed and showed strong possibilities of profitable business.

"The new alloy has met with distinct favor among the manufacturers, and the board of directors are now of the opinion that its manufacture should be pushed to the fullest extent. In order to take fullest advantage of the opportunities which it offers it is neces-sary that the facilities for its production at the Huron Metals Company plant be increased. Under the form of the present lease it would be unwise for this company to finance any such increase in facilities, and the board of directors is therefore strongly of the opinion that the two companies should be consolidated. The two companies are already so closely identified that some of the directors of each company are stockholders in the other company, but the plan of consolidation to be submitted for approval to the stockholders of both companies has been reached after a very long and careful consideration."

[3] This call therefore disclosed that some of the directors of Huron were stockholders in Baush and some of the directors of Baush were stockholders in Huron. The written offer of Huron, submitted at the meeting of the stockholders held on July 26, 1921, also disclosed that Caleb Loring was the treasurer of that company. There was ample evidence to sustain the finding of the trial court that there was no fraud or concealment of facts from the stockholders which should have been known to them. If the finding of the District Court as to whether there was fraud or concealment practised by any of the directors of Baush was an inference drawn from proven facts, we have, after a careful consideration of the whole record and the briefs of counsel, reached the same conclusion, viz.: That the directors of Baush acted in good faith and exercised their best judgment in securing a plant at which the new metal could be manufactured; that Baush needed some additional business to insure its future prosperity, and that the manufacture of duralumin seemed in the judgment of those interested to offer a field which would secure a profitable return to its stockholders; that the Huron plant was well adapted for the manufacture of duralumin; that there was nothing unfair to the stockholders of Baush in the consolidation which was effected; that the stockholders of Huron received no secret benefits; and that the defendants who met with losses in the Metals Company will recoup these losses only if Baush is prosperous in the future.

We are not confronted with a situation in which there was an inadequacy of consideration, for the District Court has found that the assets of Huron which were transferred were of the value of $855,000 in addition to the value of the patent for the manufacture of duralumin which it had acquired from De Lavandeyra, and that the stock of Baush which was issued for the same had a value of $46 per share, after deducting a book asset

of about $1,200,000 which covered good will and patents, many of which were valueless and some of which had expired. There was evidence to sustain both of these findings. Baush had in its treasury 5,000 shares of the common stock of Huron, and Huron had in its treasury 500 shares of its common and 670 shares of its preferred stock which became the property of Baush upon the consolidation. It therefore became necessary for Baush to issue to stockholders of Huron 19,080 shares of its stock, which at $46 per share, its value found by the District Court, would amount to $877,680.

Looking at the condition of a losing business which confronted both corporations and the profit which the future promised in the manufacture of duralumin in the light of the success which it had already attained and the wide field for its use disclosed by the uncontradicted testimony of experts, the consolidation was one which would commend itself to wise and prudent men forecasting the future and exercising their best ·judgment for the interests of all the stockholders.

The other assignments of error raise no questions which were not correctly disposed of by the trial judge, who gave a very careful and extended hearing to the parties, visited the properties, and has written an opinion in which he has made findings and rulings upon every detail of the many transactions involved, as well as the connection of the different parties with the two corporations. An expression of our views would be substantially a repetition of what he has found and ruled.

The decree of the District Court is affirmed, with costs to the appellees in this court.